Robert W. Brownlie (Bar No. 138793)
Ryan T. Hansen (Bar No. 234329)
**BROWNLIE HANSEN LLP**
10920 Via Frontera, Suite 550
San Diego, California 92127
Tel:   858.357.8001
Robert.Brownlie@brownliehansen.com
Ryan.Hansen@brownliehansen.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

RICK AMES and VERONICA AMES, as
trustees of THE AMES FAMILY TRUST
DATED DECEMBER 10, 1989; ELLYN
LEVINE as trustee of THE MD FOR
LIFE INC PENSION PLAN; JOHN
MCDOUGALL as trustee of THE JOHN
MCDOUGALL TRUST DATED
FEBRUARY 6, 2014; JAMES
HANFORD as trustee of THE JAMES D.
HANFORD LIVING TRUST;
CHENHAO DONG and CHUNYING
BAI as trustees of THE DONG AND BAI
FAMILY TRUST DATED NOVEMBER
23, 2014; RICHARD HANSON as trustee
of THE HANSON LIVING TRUST
DATED FEBRUARY 15, 2001; LYNN
KILLMAN as the sole member of
IRONGRAN, LLC; KENNETH
THOMPSON as trustee of THE
THOMPSON LIVING TRUST; MAX
DYKMANS as trustee of THE
DYKMANS FAMILY TRUST DATED
MARCH 22, 1985; MABEL LEUNG HO
as trustee of THE MABEL LEUNG HO
TRUST; JORGE WEINGARTEN and
MARISA WEINGARTEN as trustees of
THE WEINGARTEN FAMILY LIVING
TRUST; DENNIS MARQUARDT as
trustee of THE DENNIS MARQUARDT
LIVING TRUST; MARSHALL LEICHT
and MARY LEICHT trustees of THE
MARSHALL LEICHT and MARY
LEICHT LIVING TRUST; MARK A.
CAMPORA and WENDY Y. CAMPORA
as trustees of THE CAMPORA FAMILY

CASE NO.

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW, ELDER FINANCIAL ABUSE, STATE SECURITIES LAW VIOLATIONS, FRAUD, NEGLIGENT MISREPRESENTATION, AND CONSPIRACY TO COMMIT FRAUD**

**JURY TRIAL DEMANDED**

{00012219}

1  TRUST DATED JANUARY 11, 2017;
2  DAVID BESON as trustee of THE
   DAVID E. BESON TRUST DATED
   DECEMBER 9, 2011; PETER CHU,
3  NANCY H. CHU and ROBERT CHU as
   trustees of THE NPR PARTNERSHIP;
4  EARL M. FOSTER and NANCY R.
   FOSTER, joint tenants by the Entirety;
5  FRANK PARTIPILO and GENEVIEVE
   PARTIPILO as trustees of THE FRANK
6  PARTIPILO and GENEVIEVE
   PARTIPILO JOINT TENANCY TRUST
7  DATED MAY 13, 2010; MARLA JULL
   SHOWFER as trustee of THE MARLA
8  JULL SHOWFER TRUST; MICHAEL
   K. LEARY as trustee of KEVIN LYNN
9  PARTNERS, LLC; CESTMIR
   HERSTUS and MARY CATHERINE
10 MCGINLEY as trustees of THE
   CESTMIR HERSTUS and MARY
11 CATHERINE MCGINLEY 1999
   REVOCABLE TRUST; DAVID
12 MONTELLATO and GIORGINA
   MONTELLATO as trustees of THE
13 MONTELLATO BYPASS TRUST;
   RICHARD J. PINE and DEBRA JO as
14 trustees of THE DEBRA JO PINE
   LIVING TRUST DATED OCTOBER 15,
15 1996; EDWARD PITARD as trustee of
   THE EDWARD PITARD LIVING
16 TRUST; MARY JAMES MOORE
   QUILLEN as trustee of THE BILLIE
17 AND HANRY MOORE FAMILY
   LIMITED PARTNERSHIP, LLP;
18 DAVID M. WEINER as trustee of THE
   DAVID M. WEINER LIVING TRUST;
19 JOHN E. MELVILLE, JR. and
   FRANCES GENE WEBER as trustees of
20 THE MELVILLE WEBER LIVING
   TRUST DATED JULY 2, 2002; GAIL
21 MUMMA as trustee of THE GEMFINCO
   TRUST DATED FEBRUARY 22, 1996;
22 MICHAEL WILLIAMS and JOLIE
   WILLIAMS as trustees of THE
23 MICHAEL AND JOLIE WILLIAMS
   FAMILY TRUST; MARK BENEDICT
24 as trustee of THE MARK BENEDICT
   LIVING TRUST; JAY FEINSOD and
25 ESTA FEINSOD as trustees of THE 43
   NORTH MAIN STREETK LLC; JOHN
26 A. BUMBARGER and VALERIE J.
   BUMBARGER as trustees of THE JOHN
27 A. BUMBARGER and VALERIE J.
   BUMBARGER FAMILY TRUST
28 DATED OCTOBER 1, 1992, AND

COMPLAINT

1  RESTATED JANUARY 25, 2017;  )
   MARTIN DE JAGER and CAROLYN  )
2  DE JAGER as trustees of THE MARTIN  )
   AND CAROLYN DE JAGER FAMILY  )
3  TRUST; RICHARD M. SANDER and  )
   ELEANOR M. SANDER as trustees of  )
4  SANDERLANDCO, LLC,  )
                                      )
5                Plaintiffs,          )
                                      )
6        v.                           )
                                      )
7  PATRICK NELSON, a resident of      )
   California; NELSON PARTNERS, LLC,  )
8  a Utah limited liability company;  )
   AXONIC CAPITAL, LLC, a Delaware    )
9  limited liability company; CLAYTON )
   DEGIANCINTO, a resident of New     )
10 York; AXSPV LLC SERIES NB CRE      )
   LENDER, a Delaware limited liability )
11 company; AXSPV LLC SERIES SBL      )
   CRE LENDER, a Delaware limited     )
12 liability company; AXSPV LLC SERIES )
   ACO CRE LENDER, a Delaware limited )
13 liability company; BURGUNDY 523    )
   OFFSHORE FUND, LTD., a Cayman      )
14 Island limited company; AXONIC     )
   SPECIAL OPPORTUNITIES SBL          )
15 MASTER FUND, LP, a Delaware limited )
   partnership; AXONIC CREDIT         )
16 OPPORTUNITIES MASTER FUND, LP,     )
   a Cayman Islands, limited partnership; NP )
17 SKYLOFT, DST, a Delaware statutory )
   trust; and DOES 1 through 50, inclusive, )
18                                     )
                Defendants.            )
19                                     )
                                      )
20 _____)

21

22

23

24

25

26

27

28

Plaintiffs allege:

## INTRODUCTION

1.      This case has the earmarks of a *Ponzi* scheme with a slight twist.  A *Ponzi* scheme is an investment fraud where money is taken from one group of investors to pay or benefit another set of investors to cover up the false promises made to all investors to perpetuate the fraud.

2.      Plaintiffs are among 261 individuals, who collectively invested $75.5 million to buy interests in a student housing project in reliance on a series of false statements in the offering documents made by the sponsor of the offering and a financier that facilitated the offering.  These misrepresentations went to the core of the very nature of the investment.

3.      The sponsor is a real estate investment firm, claiming to specialize in acquiring and managing off-campus student housing projects.  The sponsor sells interests in each project to a group of unrelated investors based on promises that the investment will provide monthly distributions, tax benefits, and the potential for capital appreciation.  The sponsor profits from fees and commissions derived from the sale of the investments and fees received by its property management arm for managing the projects.

4.      The offering documents promised that the money invested by Plaintiffs would be used by the trust **exclusively** to acquire the student housing project and pay associated acquisition costs.  Instead, like a *Ponzi* scheme, the sponsor misappropriated the investor funds to pay for the next project that it would sell to another group of investors.  This misappropriation prevented the sponsor from repaying bridge financing provided by the financier, directly contravening their representation that the bridge financing would be repaid from the offering before any other expenses were paid.  This failure to repay the bridge financing ultimately gave the financier the ability to exercise rights provided to it by the sponsor that the sponsor and financier **concealed** from Plaintiffs and the other investors.  Through

those concealed rights, the financier seized control of the trust and "sold" the project to an entity that it owned and controlled, erasing Plaintiffs' entire investment. Plaintiffs had no reason to believe that the financier had those concealed rights because such rights are unheard of for this type of investment and the offering documents represented that a failure to repay the bridge financing would ***only*** reduce the amount of the distributions promised to Plaintiffs.

5.      The misappropriation also rendered another promise in the offering documents false; namely, that the investment would qualify as a like-kind exchange under Internal Revenue Code Section 1031.  To qualify as a like-kind exchange, all of the money invested had to have been used to pay for the student housing project and acquisition costs.  The sponsor's misappropriation of the money Plaintiff invested made this promise false.

6.      The offering documents also promised monthly distributions of the net rental income from the student housing project.  But the distributions stopped in March 2020, which was a distribution for February 2020 rent.  While the sponsor blamed the COVID-19 crisis on the cessation of the distributions, the sponsor's former employees have reported that even before COVID-19 (1) the promised distributions were unrealistic and could not be achieved and (2) the sponsor routinely took rents from better performing projects to pay distributions for poorer performing projects to cover up the misrepresentations in the offering documents, which is also like a *Ponzi* scheme.

7.      In the end, the sponsor took $75.5 million from Plaintiffs and the other investors.  The financier now owns through an entity that it owns and controls the student housing project that is worth approximately $124 million.  And Plaintiffs are left with interests in a trust that has been stripped of its value, leaving Plaintiffs with nothing.  Plaintiffs, therefore, sue the sponsor, the financier and their respective affiliates to recover damages resulting from their fraud.

////

**OVERVIEW**

8.      Plaintiffs, many of whom are senior citizens, are investors in NP Skyloft, DST (the "Trust"), who have lost their entire investment in the Trust as a result of Defendants' fraud.  Patrick Nelson ("Nelson") and his firm, Nelson Partners, LLC ("Nelson Partners"), together with a New York-based hedge fund, Axonic Capital LLC ("Axonic") under the direction of financier Clayton DeGiacinto ("DeGiacinto"), enticed Plaintiffs to invest in the Trust through a series of misrepresentations and omissions of material facts about the true nature of the investment and the risks associated with it.

9.      Nelson Partners syndicates investments in student housing projects and manages those properties for its investors.  Nelson Partners represents that "[o]ur strategy is simple.  We try to understand what investors are looking for and what they value most; then find opportunities that best align with those goals.  It was this mindset that pointed us toward student housing."  Nelson Partners describes its syndicated investments as the "Optimal Investment Strategy" and represents that "Student housing provides appreciation potential, an inflation hedge, portfolio diversification, and monthly income with tax efficiency through depreciation anchored by student housing assets."

10.      Nelson Partners sponsored the offering of interests in the Trust and was the driving force behind it.  While the investments in the Trust were only offered to accredited investors, Nelson Partners targeted "smaller investors" for investments in what Nelson Partners claimed were "institutional-grade properties."  Nelson Partners structured the offering to allow individuals to reinvest into the Trust the proceeds they received from the sale of real estate.  Nelson Partners represented that an investment in the Trust would give Plaintiffs a beneficial ownership interest in the Trust's sole asset, a student housing project (the "Trust Property").  Through the represented structure, Plaintiffs could treat an investment in the Trust as a like-kind exchange under Internal Revenue Code Section 1031, allowing them to defer the

payment of taxes on the gains realized from the sale properties by Plaintiffs before investing in the Trust.  As Nelson Partners touted on its website, "[a] Student Housing 1031 exchange allows you to defer paying taxes when you sell an investment property, by reinvesting the proceeds in a qualifying replacement student housing investment property under the Internal Revenue Code Section 1031."

11.    A key requirement for any Section 1031 exchange is that ***all*** the net proceeds from the sale of an investor's property must be used to pay for the replacement property — here, the student housing project — and directly related acquisition costs.  For this reason, the offering materials for the investment in the Trust detailed how the investors funds would be used.  And the offering materials represented that all investor funds would be used to purchase the Trust Property, pay costs associated with the purchase of the property, and pay commissions. Unfortunately, for Plaintiffs, this representation and other representations in the offering materials were not true, leading to a series of events that caused Plaintiffs collectively to lose tens of millions of dollars.

12.    Plaintiffs invested in the Trust based on Defendants' representations that: (1) The money invested by Plaintiffs would be used exclusively to pay for the purchase of the Trust Property and certain associated expenses and commissions; (2) Preferred Equity Providers (defined below) would be paid-off using the money invested by Plaintiffs before any other fees or expenses associated with the purchase of the Trust Property could be paid; (3) Plaintiffs only risked a reduction in "cash flow available to operate the Property and to pay distributions to the Investors" if the Preferred Equity Providers could not be repaid in full from the offering; and (4) Plaintiffs and the other investors would receive monthly distributions of all of the net cash from the operation of the Trust Property.  These representations were set forth in Confidential Private Placement Memorandum for NP Skyloft, DST, dated December 19, 2018 (the "PPM") and Supplement to PPM, dated March 2, 2019 (the "Supplement").  Tragically, these representations turned out to be false.

13.    Nelson Partners, the sponsor of the offering, raised $75.5 million from Plaintiffs and other investors through the sale of the interests in the Trust.  Plaintiffs collectively invested tens of millions of dollars.  Plaintiffs are informed and believe and thereon allege that instead of using the investor funds to pay for the acquisition of the Trust Property as represented, Nelson Partners misappropriated a substantial portion of the money raised from the offering and did not apply Plaintiffs' funds as represented in the PPM and Supplement.

14.    As a result of the misappropriation, Nelson Partners and its affiliate, NP Skyloft JV, LLC ("JV LLC"), failed to repay the Preferred Equity Providers. Plaintiffs are informed and believe and thereon allege that notwithstanding the failure of the Nelson Partners and JV LLC to repay the Preferred Equity Providers, Nelson Partners paid to itself and its affiliates an estimated $6,522,800 in the following amounts:

$3,660,000 paid to Nelson Partners Property Management, Inc. ("NP-PM");

$2,280,000 paid to Nelson Partners;

$175,000 paid to Nelson Partners for its "internal legal staff"; and

$407,800 paid to Nelson Partners for "organizational and offering costs." The payment of such fees to itself and its affiliates directly contravened the representation made to Plaintiffs and the other investors that the Preferred Equity Providers would be paid-off **before** any other fees or expenses associated with the purchase of the Trust Property could be paid.

15.    The failure of Nelson Partners and JV LLC to repay the Preferred Equity Providers allowed Axonic through its affiliates to seize control of the Trust through rights given to the Preferred Equity Providers that Nelson Partners and Axonic deliberately concealed from Plaintiffs and the other investors.  After taking control of the Trust, Axonic sold the Trust Property to a related entity that it owned and controlled.  Nelson Partners gave Axonic the right to take control of the Trust and sell the Trust Property even though JV LLC — not the Trust — was obligated to

repay the Preferred Equity Providers.  Even worse, Axonic's sale of the Trust Property to itself did not eliminate or pay down the debt owed for the repayment of the Preferred Equity Providers even one cent.  All that the sale of the Trust Property accomplished was to wipe-out Plaintiffs' entire investment and transfer all the equity in the Trust Property and the stream of income provided by it to the entity owned and controlled by Axonic.

16.     Before Axonic sold the Trust Property to itself, Nelson Partners stopped paying distributions in March 2020.  While the payment of distributions may have been to cover-up the failure of Nelson Partners and JV LLC to repay the Preferred Equity Providers, Plaintiffs are informed and believe and thereon allege that Nelson Partners comingled funds of the various student housing projects syndicated and managed by it.  Plaintiffs are further informed and believe and thereon allege Nelson Partners and NP-PM failed to keep accurate accounting records for the operation of the student housing projects, including the Trust Property, owned by the 24 trusts syndicated and managed by Nelson Partners, making it difficult, if not impossible, to determine the proper amounts of the distributions that Plaintiffs are entitled to receive.  As a result of the comingling and inaccurate accounting records, Nelson Partners' representation that Plaintiffs and the other investors would receive all the available net cash from the operation of the Trust Property was false when made.

17.     As a result of the Defendants' misrepresentations, Plaintiffs have lost a total of tens of millions and have not received the income Defendants represented that they would receive.  Plaintiffs, therefore, bring this action to recover the damages caused by Defendants' fraud.

**PARTIES**

18.     Plaintiffs are:

a.     RICK AMES and VERONICA AMES were residents of the State of CALIFORNIA and were 62 and 60 years old at the time of investment.

RICK AMES and VERONICA AMES, are trustees of THE AMES FAMILY TRUST DATED DECEMBER 10, 1989, which invested $25,000 in reliance on the representations in the PPM and the Supplement.

b.      ELLYN LEVINE was a resident of the State of CALIFORNIA and is 53 years old at the time of investment. ELLYN LEVINE is the trustee of THE MD FOR LIFE INC PENSION PLAN, which invested $50,000 in reliance on the representations in the PPM and the Supplement.

c.      JOHN MCDOUGALL was a resident of the State of NEVADA and is 66 years old at the time of investment. JOHN MCDOUGALL is the trustee of THE JOHN MCDOUGALL TRUST DATED FEBRUARY 6, 2014, which invested $50,000 in reliance on the representations in the PPM and the Supplement.

d.      JAMES HANFORD was a resident of the State of FLORIDA and is 66 years old at the time of investment. JAMES HANFORD is the trustee of THE JAMES D. HANFORD LIVING TRUST, which invested $70,000 in reliance on the representations in the PPM and the Supplement.

e.      CHENHAO DONG and CHUNYING BAI were residents of the State of CALIFORNIA and were 60 and 59 years old at the time of investment. CHENHAO DONG and CHUNYING BAI are trustees of THE DONG AND BAI FAMILY TRUST DATED NOVEMBER 23, 2014, which invested $75,043.78 in reliance on the representations in the PPM and the Supplement.

f.      RICHARD HANSON was a resident of the State of FLORIDA and is 66 years old at the time of investment. RICHARD HANSON is the trustee of THE HANSON LIVING TRUST DATED FEBRUARY 15, 2001, which invested $100,000 in reliance on the representations in the PPM and the Supplement.

g.      LYNN KILLMAN was a resident of the State of GEORGIA and is 62 years old at the time of investment. LYNN KILLMAN is the sole member of IRONGRAN, LLC, which invested $100,000 in reliance on the representations in the PPM and the Supplement.

h.   KENNETH THOMPSON was a resident of the State of CALIFORNIA and is 59 years old at the time of investment.  KENNETH THOMPSON is the trustee of THE THOMPSON LIVING TRUST, which invested $100,000 in reliance on the representations in the PPM and the Supplement.

i.   MAX DYKMANS was a resident of the State of CALIFORNIA and is 70 years old at the time of investment.  MAX DYKMANS is the trustee of THE DYKMANS FAMILY TRUST DATED MARCH 22, 1985, which invested $102,000 in reliance on the representations in the PPM and the Supplement.

j.   MABEL LEUNG HO of the State of TEXAS and is 71 years old at the time of investment.  MABEL LEUNG HO is the trustee of THE MABEL LEUNG HO TRUST, which invested $103,125 in reliance on the representations in the PPM and the Supplement.

k.   JORGE WEINGARTEN and MARISA WEINGARTEN were residents of the State of CALIFORNIA and were 58 years old at the time of investment.  JORGE WEINGARTEN and MARISA WEINGARTEN are trustees of THE WEINGARTEN FAMILY LIVING TRUST, which invested $125,000 in reliance on the representations in the PPM and the Supplement.

l.   DENNIS MARQUARDT was a resident of the State of ARIZONA and is 79 years old at the time of investment.  DENNIS MARQUARDT is the trustee of THE DENNIS MARQUARDT LIVING TRUST, which invested $148,503.09 in reliance on the representations in the PPM and the Supplement.

m.   MARSHALL LEICHT and MARY LEICHT were residents of the State of TEXAS and were 65 and 66 years old at the time of investment. MARSHALL LEICHT and MARY LEICHT invested $162,006.85 in reliance on the representations in the PPM and the Supplement.

n.   MARK A. CAMPORA and WENDY Y. CAMPORA were residents of the State of CALIFORNIA and were 66 and 65 years old at the time of investment.  MARK A. CAMPORA and WENDY Y. CAMPORA are trustees of

THE CAMPORA FAMILY TRUST DATED JANUARY 11, 2017, which invested $191,467.49 in reliance on the representations in the PPM and the Supplement.

o.      DAVID BESON was a resident of the State of FLORIDA and is 67 years old at the time of investment.  DAVID BESON is the trustee of THE DAVID E. BESON TRUST DATED DECEMBER 9, 2011, which invested $198,098.25 in reliance on the representations in the PPM and the Supplement.

p.      PETER CHU, NANCY H. CHU and ROBERT CHU were residents of the State of MARYLAND and were 65, 67 and 57 years old at the time of investment.  PETER CHU, NANCY H. CHU and ROBERT CHU are trustees of THE NPR PARTNERSHIP, which invested $200,000 in reliance on the representations in the PPM and the Supplement.

q.      EARL M. FOSTER and NANCY R. FOSTER were residents of the State of FLORIDA and were 79 and 76 years old at the time of investment. EARL M. FOSTER and NANCY R. FOSTER, invested $200,000 in reliance on the representations in the PPM and the Supplement.

r.      FRANK PARTIPILO and GENEVIEVE PARTIPILO were residents of the State of ILLINOIS and were 80 years old at the time of investment. FRANK PARTIPILO and GENEVIEVE PARTIPILO are trustees of THE FRANK PARTIPILO and GENEVIEVE PARTIPILO JOINT TENANCY TRUST DATED MAY 13, 2010, which invested $200,000 in reliance on the representations in the PPM and the Supplement.

s.      MARLA JULL SHOWFER was a resident of the State of ILLINOIS and is 58 years old at the time of investment.  MARLA JULL SHOWFER is the trustee of THE MARLA JULL SHOWFER TRUST, which invested $200,050 in reliance on the representations in the PPM and the Supplement.

t.      MICHAEL K. LEARY was a resident of the State of CALIFORNIA and is 63 years old at the time of investment.  MICHAEL K.

LEARY is the trustee of KEVIN LYNN PARTNERS, LLC, which invested $271,474.19 in reliance on the representations in the PPM and the Supplement.

u.      CESTMIR HERSTUS and MARY CATHERINE MCGINLEY were residents of the State of CALIFORNIA and were 63 and 60 years old at the time of investment.  CESTMIR HERSTUS and MARY CATHERINE MCGINLEY are trustees of THE CESTMIR HERSTUS and MARY CATHERINE MCGINLEY 1999 REVOCABLE TRUST, which invested $282,253 in reliance on the representations in the PPM and the Supplement.

v.      DAVID MONTELLATO and GIORGINA MONTELLATO were residents of the State of CALIFORNIA and were 90 and 66 years old at the time of investment.  DAVID MONTELLATO and GIORGINA MONTELLATO are trustees of THE MONTELLATO BYPASS TRUST, which invested $300,000 in reliance on the representations in the PPM and the Supplement.

w.      RICHARD J. PINE and DEBRA JO were residents of the State of OREGON and were 64 and 59 years old at the time of investment.  RICHARD J. PINE and DEBRA JO are trustees of THE DEBRA JO PINE LIVING TRUST DATED OCTOBER 15, 1996, which invested $328,310.48 in reliance on the representations in the PPM and the Supplement.

x.      EDWARD PITARD was a resident of the State of LOUISIANA and is 66 years old at the time of investment.  EDWARD PITARD is the trustee of THE EDWARD PITARD LIVING TRUST, which invested $397,635.74 in reliance on the representations in the PPM and the Supplement.

y.      MARY JAMES MOORE QUILLEN was a resident of the State of VIRGINIA and is 69 years old at the time of investment.  MARY JIM QUILLEN is the trustee of THE BILLIE AND HANRY MOORE FAMILY LIMITED PARTNERSHIP, LLP, which invested $400,000 in reliance on the representations in the PPM and the Supplement.

////

z.      DAVID M. WEINER was a resident of the State of ILLINOIS and is 83 years old at the time of investment.  DAVID M. WEINER is the trustee of THE DAVID M. WEINER LIVING TRUST, which invested $450,000 in reliance on the representations in the PPM and the Supplement.

aa.      JOHN E. MELVILLE, JR. and FRANCES GENE WEBER were residents of the State of CALIFORNIA and were 70 and 68 years old at the time of investment.  JOHN E. MELVILLE, JR. and FRANCES GENE WEBER are trustees of THE MELVILLE WEBER LIVING TRUST DATED JULY 2, 2002, which invested $460,000 in reliance on the representations in the PPM and the Supplement.

bb.      GAIL MUMMA was a resident of the State of CALIFORNIA and is 84 years old at the time of investment.  GAIL MUMMA is the trustee of THE GEMFINCO TRUST DATED FEBRUARY 22, 1996, which invested $494,052.36 in reliance on the representations in the PPM and the Supplement.

cc.      MICHAEL WILLIAMS and JOLIE WILLIAMS were residents of the State of CALIFORNIA and were 57 and 56 years old at the time of investment.  MICHAEL WILLIAMS and JOLIE WILLIAMS are trustees of THE MICHAEL AND JOLIE WILLIAMS FAMILY TRUST, which invested $500,000 in reliance on the representations in the PPM and the Supplement.

dd.      MARK BENEDICT was a resident of the State of CALIFORNIA and is 59 years old at the time of investment.  MARK BENEDICT is the trustee of THE MARK BENEDICT LIVING TRUST, which invested $520,670.32 in reliance on the representations in the PPM and the Supplement.

ee.      JAY FEINSOD and ESTA FEINSOD were residents of the State of CONNECTICUT and were 77 and 76 years old at the time of investment.  JAY FEINSOD and ESTA FEINSOD are trustees of THE 43 NORTH MAIN STREETK LLC, which invested $600,000 in reliance on the representations in the PPM and the Supplement.

ff.    JOHN A. BUMBARGER and VALERIE J. BUMBARGER were residents of the State of CALIFORNIA and were 74 and 66 years old at the time of investment.  JOHN A. BUMBARGER and VALERIE J. BUMBARGER are trustees of THE JOHN A. BUMBARGER and VALERIE J. BUMBARGER FAMILY TRUST DATED OCTOBER 1, 1992, AND RESTATED JANUARY 25, 2017, which invested $750,000 in reliance on the representations in the PPM and the Supplement.

gg.    MARTIN DE JAGER and CAROLYN DE JAGER were residents of the State of CALIFORNIA and were 61 and 59 years old at the time of investment.  MARTIN DE JAGER and CAROLYN DE JAGER are trustees of THE MARTIN AND CAROLYN DE JAGER FAMILY TRUST, which invested $750,000 in reliance on the representations in the PPM and the Supplement.

hh.    RICHARD M. SANDER and ELEANOR M. SANDER were residents of the State of WASHINGTON and were 73 and 74 years old at the time of investment.  RICHARD M. SANDER and ELEANOR M. SANDER are trustees of SANDERLANDCO, LLC, which invested $1,004,203 in reliance on the representations in the PPM and the Supplement.

19.    Defendant Patrick Nelson is a resident of Orange County, California. Nelson is the sole owner, manager, president, and chief executive officer of Nelson Partners.

20.    Defendant NP Skyloft, DST is a Delaware statutory trust with its principal place of business in Orange County, California.

21.    Defendant Nelson Partners, LLC is a limited liability company organized under the laws of the State of Utah with its principal place of business in Orange County, California.  Nelson Partners sponsored the offering of the interests in the Trust.  As the sponsor of the offering of the interests, Nelson Partners formed the Trust and the affiliated entities, and was responsible for the content of the PPM and the Supplement.

COMPLAINT

22.     Defendant Axonic Capital LLC is a Delaware limited liability company and is an investment advisor and/or hedge fund or hedge fund manager.

23.     Defendant Clayton DeGiacinto is a resident of the state of New York. DeGiacinto is the Managing Member and Chief Investment Officer of Axonic.

24.     Defendants AxSPV LLC Series NB CRE Lender, AxSPV LLC Series SBL CRE Lender, and AxSPV LLC Series ACO CRE Lender are Delaware limited liability companies and are funds affiliated with, and controlled by, Axonic. Defendant Burgundy 523 Offshore Fund, Ltd. ("Burgundy") is a Cayman Island limited company and is the successor in interest to AxSPV LLC Series NB CRE Lender.  Plaintiffs are informed and believe and thereon allege that Axonic and DeGiacinto manage and control Burgundy.  Defendant Axonic Special Opportunities SBL Master Fund, LP is a Delaware limited partnership and is the successor in interest to AxSPV LLC Series SBL CRE Lender.  Plaintiffs are informed and believe and thereon allege that Axonic and DeGiacinto manage and control Axonic Special Opportunities SBL Master Fund, LP.  Defendant Axonic Credit Opportunities Master Fund, LP ("Master Fund") is a Cayman Island limited partnership and is the successor in interest to AxSPV LLC Series ACO CRE Lender. AxSPV LLC Series NB CRE Lender, AxSPV LLC Series SBL CRE Lender, AxSPV LLC Series ACO CRE Lender, Burgundy, Axonic Special Opportunities SBL Master Fund, LP, and Master Fund are referred to collectively as the "Preferred Equity Providers."

## JURISDICTION AND VENUE

25.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated under §10 of the Exchange Act.   In addition, because this is a civil action arising under the laws of the United States, the Court has jurisdiction pursuant to 28 U.S.C. §1331.

////

26.     Venue in this district is proper pursuant to §27 of the Exchange Act. Many of the false or misleading statements were made in or issued from this district.

27.     The Nelson Partners' principal place of business is located in Orange County, California, and Defendant Nelson resides in Orange County, California. Certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading statements to the Investors, occurred in this district.

28.     In connection with the acts and conduct alleged in this complaint, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## BACKGROUND

29.     Nelson Partners represents that it "is a nationally recognized real estate investment firm specializing in developing, acquiring and managing high quality purpose-built off-campus student housing properties throughout the U.S." Nelson and Nelson Partners claim that they have practical knowledge and understanding of Section 1031 strategies. Such knowledge and experience, according to Nelson and Nelson Partners, allows Nelson Partners to put "together 1031-eligible investments in real estate, which would "[e]nable smaller investors to own institutional-grade properties."

30.     Nelson Partners sponsored the offering of interests in the Trust. As the sponsor, Nelson Partners identified and acquired the Trust Property, took the lead in preparing the PPM and the Supplement, and was responsible for the administration of the investor funds received from the offering.

31.     The PPM represented to Plaintiffs that "[t]he investment objectives of the Trust are to acquire and manage the [Trust] Property to generate income with tax benefits, preserve principal and provide the potential for long-term growth." The PPM projected that in years 1 and 2 of Plaintiffs' investment, the Trust would pay a 6.13% return to them which it projected would increase to 7.00% in years 9 and 10.

COMPLAINT

The PPM further disclosed that the Trust ultimately would sell the Trust Property and return to the Investors their investments and their proportionate share of the Trust Property's appreciation.

32.     The tax benefits offered by the investment in the Trust included the deferral of the payment of taxes on the sale of property under Internal Revenue Code Section 1031.  Tracing its roots back to Revenue Act of 1921, Section 1031 allows a taxpayer to postpone the payment of income taxes on gains derived from the sale of real estate through a like-kind exchange if certain conditions are met.

33.     A like-kind exchange involves the sale of the taxpayer's initial property, referred to as the "Relinquished Property," and the acquisition of the new property, referred to as the "Replacement Property."  Among the requirements to qualify as a like-kind exchange under Section 1031 is that the proceeds from the sale of the Relinquished Property can be used *only* to buy Replacement Property, pay closing costs or pay off a mortgage or deed of trust covering the Relinquished Property.  If the funds are used for any other purpose, the Internal Revenue Service may disqualify the transaction as a like-kind exchange under Section 1031, which would expose the taxpayer to additional tax liability, interest and penalties.

34.     The PPM and Supplement are filled with representations that the investment was structured to comply with Section 1031 and that "an Investor's acquisition of an Interest 'should' be treated as a direct acquisition of an interest in the Property for purposes of Section 1031."  The PPM and Supplement cautioned that each investors' "own particular circumstances" — such as, whether the Relinquished Property qualifies and whether the timing requirements are met — ultimately would determine whether the IRS would allow the purchase of an Interest to be treated as like-kind exchange.  But for its part, Nelson Partners represented that "the acquisition of an Interest by an Investor should be treated as the direct acquisition of the Property by the Investor for purposes of Section 1031."  The PPM further represented that the Trust Agreement between the Trust, the trustee and the

investors included provisions "[t]o protect the tax-free exchange status for the Investors under Section 1031."

## REPRESENTATIONS ABOUT USE OF INVESTOR FUNDS

35.     The PPM represented that "[t]he Offering Proceeds will be used to cover the reimbursement of closing, financing, and acquisition costs that the Trust or the Sponsor incurred in connection with the acquisition of the Property and the sale of the Interests and to pay any other deferred fees and expenses."  This representation is consistent with the requirements of a Section 1031 exchange.  The PPM had a section entitled, "Estimated Use of Proceeds," which included multiple tables showing that the funds invested by Plaintiffs would be used to pay for the acquisition of the Trust Property and associated fees, expenses and commissions. The PPM further represented that the Trust cannot "commingle its assets with those of any other person."

36.     The Supplement updated the "Estimated Use of Proceeds" section of the PPM.  The update continued to represent that the funds invested by Plaintiffs would be used to pay for the acquisition of the Trust Property and associated fees, expenses and commissions.

## REPRESENTATIONS ABOUT PREFERRED EQUITY

37.     The PPM represented that to close the acquisition of the Trust Property before sufficient interests were sold to finance the acquisition together with the proceeds of a loan from UBS AG, the Trust, through Nelson Partners, might obtain capital from a "Preferred Equity Provider."  The PPM represented that if used, Nelson Partners would cause the Trust to use such capital to close the acquisition of the Trust Property.  The PPM further represented in two separate sections that "[i]f capital is provided by the Preferred Equity Provider, then upon the sale of Interests, the net proceeds, less commissions and fees paid to broker dealers and their representatives, will be used to repay such capital."

////

38.     The PPM included a paragraph captioned "RISKS RELATED TO THE PREFERRED EQUITY," in which it made only the following disclosure as to the risk related to the Preferred Equity:

> If utilized, the provision of capital by the Preferred Equity Provider would allow the acquisition of the Property to close prior to the sale of sufficient Interests to raise the minimum required closing equity. If capital is provided by the Preferred Equity Provider, subject to limited exceptions, all net sales proceeds from the sale of Interests must be used to repay to the Preferred Equity Provider the capital it invested. If insufficient Interests are sold, the Preferred Equity Provider may not be fully repaid and there may be insufficient funds to pay the expenses, fees and commissions set forth in the Estimated Use of Proceeds (See "ESTIMATED USE OF PROCEEDS") that were not paid at the closing of the acquisition. If proceeds from the sale of Interests are not available to pay such expenses, fees and commissions, then the Trust may be required to use income from the Property to pay such items, reducing cash flow available to operate the Property and to pay distributions to the Investors.

39.     The PPM, thus, represented that the most serious and only risk to Plaintiffs if Nelson Partners failed to repay the Preferred Equity Provider would be a reduction in the "cash flow available to operate the Property and to pay distributions to the Investors." They were never told that a failure to repay could result in the loss of the Trust Property.

40.     Nelson Partners issued the Supplement dated March 2, 2019. The Supplement represented that (a) on February 26, 2019, the Trust acquired the Trust Property for $123,210,000 plus transaction costs and expenses (for a total of $132,124,000) and (b) "a preferred equity provider contributed $35,000,000 to the Trust, through Affiliates of the Trust, which capital was used to close the acquisition" of the Trust Property. The Supplement further represented that "[t]hree special purpose entities, each owned by a separate investment fund managed by Axonic Capital, provided the preferred capital." The Supplement (and this Complaint) collectively defined those special purpose entities as the "Preferred Equity Providers."

41.     The Supplement repeated the representation in the PPM that "[u]pon the sale of Interests, the net proceeds, less commissions and fees paid to broker dealers and their representatives, will be used to repay the capital contributed by the Preferred Equity Providers."

42.     The Supplement does not update the risk factor in the PPM the most serious and only risk to Plaintiffs if Nelson Partners failed to repay the Preferred Equity Provider was a reduction in the "cash flow available to operate the Property and to pay distributions to the Investors."

## REPRESENTATIONS ABOUT DISTRIBUTIONS

43.     Nelson Partners represented that "Investors can sell a little/no income producing property (e.g. land) and purchase property(s) with greater cash flow performance (e.g. student housing)."

44.     The PPM represented that "[t]he Investors will be entitled, based on their respective Interests in the Trust, to all operating cash flow of the Trust, if any, and all net cash proceeds from any sale, exchange, or refinancing of the Property, after payment of amounts due under the Loan and reimbursement of the Trustees for expenses and reserves for amounts necessary to pay anticipated ordinary current and future expenses of the Trust."  The PPM further represented "[a]ny such cash flow will be distributed on a monthly basis."

45.     The PPM included projections for the amount of cashflow that the Investors should expect.  The Supplement updated those projections, representing that Investor should expect to receive on a monthly basis distributions as follows:

| Lease Year | Estimated Annual Gross Stated Rent as a Percentage of Equity |
|---|---|
| Lease Years 1 and 2 | 6.13% |
| Lease Year 3 | 6.23% |
| Lease Year 4 | 6.25% |

| Lease Years 5 and 6 | 6.50% |
| Lease Years 7 and 8 | 6.75% |
| Lease Years 9 and 10 | 7.00% |

46.     The Supplement's representation that distributions would increase over time was consistent with Nelson Partners' representation on its website that "[o]verall the rental revenue, rental rates, and net operating income in student housing properties across the country have continued to rise year over year due to student demand and limited space."

### THE OFFERING RAISED $75.5 MILLION

47.     The offering of the interests closed in February 2020 after raising approximately $75.5 million.  Plaintiffs collectively invested tens of millions of dollars in reliance on the misrepresentations and omissions in the PPM and the Supplement.

48.     Plaintiffs stopped receiving monthly distributions in March 2020. Blaming the COVID-19 pandemic, Nelson Partners suspend the distributions, which have not resumed as of the date this Complaint was filed.

### PLAINTIFFS LEARN THE TRUST PROPERTY WAS "SOLD"

49.     On December 30, 2020, Plaintiffs received a letter, dated December 22, 2020, from a law firm named, Cain & Skarnulis PLLC.  The letter represented that the law firm was writing "on behalf of the Special Members of NP Skyloft JV, LLC, the sole member of the Signature Trustee."  The letter told Plaintiffs that "[p]ursuant to Section 5.03 of the Trust Agreement, you are hereby notified that the Signature Trustee intends to cause the Trust to sell the [Trust] Property in a simultaneous sign-and-close transaction."  No other information was provided about the proposed sale of the Trust Property and the letter failed to name the "Special Members."  The letter also says nothing about Nelson Partners' failure to repay the Preferred Equity Providers.

////

50.     In late January 2021, Plaintiffs received another letter from Cain & Skarnulis PLLC, dated January 22, 2021.  The letter represented that the trustee sold the Trust Property to TCG Skyloft Owner, LLC ("TCG").  The letter did not disclose the amount received by the Trust from the sale of the Trust Property.  The letter, however, represented that Nelson Partners had only repaid $5,127,677.02 of the $35,000,000 owed by Nelson Partners to the Preferred Equity Providers.  The letter further represented that Nelson Partners' failure to repay the Preferred Equity Providers gave the Preferred Equity Providers certain rights, including a "forced sale mechanism," allowing them to sell the Trust Property.  Those rights, including the forced sale mechanism, were not disclosed in the PPM or the Supplement.

51.     Plaintiffs later learned that Axonic sold the Trust Property to an entity formed by it and another entity, called TCG Skyloft Owner LLC (the "Buyer"), which is completely owned by TCG Skyloft JV LLC.  Axonic and the other entity own TCG Skyloft JV LLC.  Axonic's interest in TCG Skyloft JV LLC and, ultimately, the Buyer, was given a value of $43,875,000.  The interest of the other owner of TCG Skyloft JV LLC is valued at only $2,000,000.  Thus, Axonic's interest in TCG Skyloft JV LLC and the Buyer is 21 times larger than the other owner of TCG Skyloft JV LLC, giving it the largest economic interest in the Buyer by a huge margin.

52.     The Limited Liability Company Agreement of TCG Skyloft JV LLC also gives Axonic management control over TCG Skyloft JV LLC, including the approval of expenditures, the re-sale of the Trust Property, budgets, business plans, the hiring of employees, and replacement or termination of officers and directors.  Thus, Axonic also has management control over the Buyer.

53.     The foregoing shows that Axonic used the Trust to sell the Trust Property to an entity in which it has supermajority economic interest and in which it controls all major decisions.  In effect, Axonic used the Trust to wipe-out the interests of Plaintiffs and the other investors and effectively give the property to

COMPLAINT

1 itself.

2 <center>**THE TRUTH EMERGES**</center>

3 54. Defendants have never voluntarily disclosed the truth to Plaintiffs or

4 the other investors. But through the investigation of Plaintiffs' counsel and

5 documents obtained from filings in other cases involving the Trust, Plaintiffs have

6 learned that the representations in the PPM and Supplement set forth above were

7 materially false and misleading.

8 <center>**NELSON PARTNERS FAILED TO USE THE INVESTOR FUNDS AS
REPRESENTED IN THE PPM AND SUPPLEMENT**</center>

9

10 55. As alleged above, the PPM represented that "[t]he Offering Proceeds

11 will be used to cover the reimbursement of closing, financing, and acquisition costs

12 that the Trust or the Sponsor incurred in connection with the acquisition of the

13 Property and the sale of the Interests and to pay any other deferred fees and

14 expenses." The PPM further represented that "[i]f capital is provided by the

15 Preferred Equity Provider, then ***upon the sale of Interests***, the net proceeds, less

16 commissions and fees paid to broker dealers and their representatives, will be used

17 to repay such capital." [Emphasis added.] The Supplement represented that

18 "***[u]pon the sale of Interests***, the net proceeds, less commissions and fees paid to

19 broker dealers and their representatives, ***will be used to repay*** the capital contributed

20 by the Preferred Equity Providers." [Emphasis added.] The offering raised

21 approximately $75.5 million and after the payment of commissions, fees and related

22 closing costs, the Supplement represented that $68,279,000 would be available to

23 use toward the acquisition of the Trust Property, which amount was more than

24 enough to repay the $35,000,000 that JV LLC owed to the Preferred Equity

25 Providers.

26 56. Nelson Partners' failure to repay the Preferred Equity Providers alone

27 shows that Nelson and Nelson Partners did not use the Plaintiffs' funds as

28 represented in the PPM and Supplement. Since the offering raised twice the amount

of money needed to repay the Preferred Equity Providers, Nelson Partners should have repaid the Preferred Equity Providers *before* the offering closed because the PPM and the Supplement represented that "***upon the sale of Interests***," the net proceeds "***will be used to repay***" the Preferred Equity Providers. These representations were ***obviously false***.

57.     Former employees of Nelson Partners have reported that Nelson Partners comingles the funds raised from its various student housing syndications and does not use such funds solely to acquire the properties as represented here in the PPM and Supplement. Such former employees have reported that funds are used to pay the acquisition costs for unrelated student housing syndications and to pay Nelson Partners' overhead expenses unrelated to the particular syndication. One former employee heard that moneys were also sent to offshore bank accounts. Correspondence from Nelson Partners' counsel to Plaintiffs and other investors in the Trust all but admits that funds from the offering of interests in the Trust were misappropriated and used to acquire another student housing project called, Sol y Luna, which Plaintiffs are informed and believes that Nelson admitted under oath in another case. Moreover, emails from Nelson to DeGiacinto after Nelson Partners failed to repay the Preferred Equity Providers state that Nelson and Nelson Partners would use money raised from subsequent student housing syndications to repay Axonic and the Preferred Equity Providers.

58.     Based on the foregoing, Plaintiffs are informed and believe and thereon allege that Nelson and Nelson Partners misappropriated the funds provided by Plaintiffs to invest in the Trust, which shows that the following representations were false when made:

      a.     "The Offering Proceeds will be used to cover the reimbursement of closing, financing, and acquisition costs that the Trust or the Sponsor incurred in connection with the acquisition of the Property and the sale of the Interests and to pay any other deferred fees and expenses;"

b.     The investment in the Trust was structured to comply with Section 1031;

c.     "An Investor's acquisition of an Interest 'should' be treated as a direct acquisition of an interest in the Property for purposes of Section 1031;"

d.     The Estimated Use of Proceeds in the PPM and the Supplement;

e.     "If capital is provided by the Preferred Equity Provider, then upon the sale of Interests, the net proceeds, less commissions and fees paid to broker dealers and their representatives, will be used to repay such capital;" and

f.     "Upon the sale of Interests, the net proceeds, less commissions and fees paid to broker dealers and their representatives, will be used to repay the capital contributed by the Preferred Equity Providers."

## AXONIC'S AND NELSON PARTNERS' MISREPRESENTATIONS ABOUT THE PREFERRED EQUITY

59.     The Supplement was issued on March 2, 2019.  Just four days before the Supplement was issued, on February 26, 2019, the Preferred Equity Providers were admitted as "Special Members" into JV, LLC.  The Preferred Equity Providers' admission to JV, LLC was made pursuant to a Limited Liability Company Agreement of NP Skyloft JV LLC, dated February 26, 2019 (the "JV LLC Agreement"), the existence and terms of which the Supplement failed to disclose.

60.     Pursuant to the secret JV LLC Agreement, the Preferred Equity Providers made their $35,000,000 capital contribution to JV LLC and, in exchange for the $35,000,000 capital contribution, the Preferred Equity Providers became "Special Members" of JV LLC and received "Special Member Interests" in JV LLC.

61.     The secret JV LLC Agreement further required that JV LLC — not the Trust — to redeem or repurchase the Preferred Equity Providers' Special Member Interests no later than February 25, 2020 (the "Mandatory Redemption") to repay the capital provided by the Preferred Equity Providers.  The Mandatory Redemption

was concealed from Plaintiffs.

62.     Pursuant to the secret JV LLC Agreement, JV, LLC's failure to make the Mandatory Redemption on or before February 25, 2020 constituted a "Material Default" and gave the Preferred Equity Providers (a) the right to an increased return on their capital contribution, (b) the right to immediately remove and replace the Managing Member of NP Skyloft JV, LLC (and to thereby control the trustee and Trust), and (c) the unilateral right and full power and authority to cause the sale of the Trust Property "to an independent third party on such terms and conditions as Special Member shall approve in the exercise of its sole and absolute discretion (a 'Forced Sale')." Such facts were concealed from Plaintiffs. Moreover, the rights given to the Preferred Equity Providers are unheard of in the context of syndicated Section 1031 exchange offerings. Consequently, Plaintiffs had no reason to suspect that they might even exist.

63.     The foregoing facts themselves constitute omissions of material fact necessary to make the representations in the PPM and Supplement about the Preferred Equity Providers not misleading. The omissions of material fact were:

      a.     The JV LLC Agreement required JV LLC to repay the Preferred Equity Providers on or before February 25, 2020;

      b.     JV LLC's failure to repay the Preferred Equity Providers on or before February 25, 2020 would constitute a material breach of the JV LLC Agreement;

      c.     JV LLC's failure to repay the Preferred Equity Providers on or before February 25, 2020 would increase by several million dollars that amount that must be paid to Axonic and the Preferred Equity Providers to redeem the capital provided by the Preferred Equity Providers;

      d.     JV LLC's failure to repay the Preferred Equity Providers on or before February 25, 2020 would allow Axonic and the Preferred Equity Providers to take control of JV LLC, the Trust's trustee and the Trust;

e.      JV LLC's failure to repay the Preferred Equity Providers on or before February 25, 2020 would allow Axonic and the Preferred Equity Providers to use their control of JV LLC, the Trust's Trustee and the Trust to sell the Trust Property;

f.      The sale of the Trust Property by Axonic and the Preferred Equity Providers pursuant to the JV LLC Agreement's default provisions would be a complete windfall for Axonic and the Preferred Equity Providers because the sale of the Trust Property by them would not satisfy or diminish the amount that must be repaid to redeem the capital provided by the Preferred Equity Providers; and

g.      The JV LLC Agreement's default provisions gave Axonic and the Preferred Equity Providers the ability to sell the Trust Property when the debt owed to them was owed by JV LLC, and not the Trust.

64.      The foregoing facts also show that the representation in the PPM that "[i]f proceeds from the sale of Interests are not available to pay such expenses, fees and commissions, then the Trust may be required to use income from the Property to pay such items, reducing cash flow available to operate the Property and to pay distributions to the Investors" was false when made.  It was false when made because a failure to repay the Preferred Equity Providers on or before February 25, 2020 would not only potentially reduce the cash flow available to pay distributions to Plaintiffs and the other investors, but it would also: (a) constitute a material breach of the JV LLC Agreement; (b) increase by several million dollars that amount that must be paid to Axonic and the Preferred Equity Providers to redeem the capital provided by the Preferred Equity Providers; (c) allow Axonic and the Preferred Equity Providers to take control of JV LLC, the Trust's Trustee and the Trust; (d) allow Axonic and the Preferred Equity Providers to use their control of JV LLC, the Trust's Trustee and the Trust to sell the Trust Property; (e) give a complete windfall for Axonic and the Preferred Equity Providers because the sale of the Trust

Property by them would not satisfy or diminish the amount that must be repaid to redeem the capital provided by the Preferred Equity Providers; and (f) give Axonic and the Preferred Equity Providers the ability to sell the Trust Property when the debt owed to them was owed by JV LLC, and not the Trust.

## NELSON PARTNERS' MISREPRESENTATIONS ABOUT DISTRIBUTIONS

65.     As alleged above, the PPM represented that Plaintiffs and the other investors would receive monthly distributions of "all operating cash flow of the Trust."  Plaintiffs, however, received only one distribution.

66.     Former employees of Nelson Partners have reported that Nelson Partners and its affiliate, NP-PM, routinely failed to pay to investors distributions based on the operating cash flows of the student housing syndications managed by them.  Instead, Nelson Partners and NP-PM, at Nelson's direction, routinely comingled funds derived from the operations of the various student housing syndications managed by them, taking excess cashflows from better performing student housing projects to pay distributions to poorer performing student housing projects to mask the poor performance.  The former employees further reported that Nelson Partners and NP-PM maintained at least two sets of accounting records; one using QuickBooks and another set is maintained on Encarta property management software.  The former employees also reported that neither set of books accurately reflected the financial positions of the student housing projects.

67.     Former employees of Nelson Partners have reported that the represented distributions in the PPM and Supplement were complete fabrications and could not be achieved over time.  The projected distributions, according to the former employees, were based on unrealistically low operating costs and annual rent increases to students and their families that could not be sustained overtime.  When employees informed Nelson that the projected distributions could not be achieved, Nelson refused to change them and only wanted to include projected distributions

that were higher than his competitors to allow Nelson Partners to continue to attract new investors for new student housing project syndications because Nelson Partners receives substantial fees and commissions from closing offerings for new syndications.  Thus, the represented distributions in the PPM and Supplement were not genuinely believed by Nelson and Nelson Partners.

68.     Plaintiffs, therefore, are informed and believe and thereon allege that Plaintiffs would receive monthly distributions of "all operating cash flow of the Trust" was false when made.

**DEFENDANTS MADE THE FALSE STATEMENTS AND OMISSIONS**

69.     Nelson and Nelson Partners prepared the PPM and the Supplement, which included the misrepresentations and omissions.  Nelson and Nelson Partners are the "makers" of the misrepresentations and omissions alleged herein.

70.     The JV LLC Agreement gave the Preferred Equity Providers the ultimate authority over the content of the Supplement.  The JV LLC Agreement defined as an event of "Material Default" as "(aa) any private offering memorandum/private placement memorandum regarding the BI Unit Sales is amended, supplemented, modified or terminated without the prior written consent of Special Member (which consent may be granted or withheld in Special Member's sole discretion)."  The "BI Unit Sales" are the sales of the interests in the Trust. The Axonic Preferred Equity Providers are the "Special Member."  Therefore, the Supplement could not have been issued without the Axonic Defendants' "prior written consent."  This gave them the ultimate authority over the Supplement and its content.

71.     DeGiacinto and Axonic controlled the Preferred Equity Providers, which acted only through the agents and employees of Axonic, including DeGiacinto.  This authority and control over the Preferred Equity Providers also cause DeGiacinto and Axonic to be the makers of the misrepresentations and omissions in the Supplement.

72.     Since the Supplement supplemented the PPM, DeGiacinto, Axonic and the Preferred Equity Providers also had ultimate authority over the PPM and its content, causing them to be the makers of the misrepresentations and omissions in the PPM as well.

## SCIENTER

73.     The allegations above, including the allegations based on information supplied by former employees of Nelson Partners, show that Nelson, Nelson Partners and the Trust, acting through Nelson and Nelson Partners, made the misrepresentations about whether the purchase of the Interests would qualify as a like-kind exchange, the uses of the funds invested by Plaintiffs, the payment of distributions, and the projected distributions, and the failure to disclose the misappropriation of the investors funds and the comingling of the cash flows from the operations of the various student housing projects syndicated and managed by them knowing the such misrepresentations and omissions were false or in reckless disregard of the truth.

74.     Nelson, Nelson Partners, the Trust (acting through Nelson and Nelson Partners), DeGiacinto, Axonic and the Preferred Equity Providers knew that the omissions and misrepresentations about the Preferred Equity were false and materially misleading.

75.     Nelson, Nelson Partners, the Trust (acting through Nelson and Nelson Partners), DeGiacinto, Axonic and the Preferred Equity Providers agreed in Section 13.20 of the JV LLC Agreement that "Managing Member agrees not to disclose or permit the disclosure of any of the terms of this Agreement or any other documents executed in connection with this Agreement or the Preferred Equity Providers …." Nelson, Nelson Partners, the Trust (acting through Nelson and Nelson Partners), DeGiacinto, Axonic and the Preferred Equity Providers further specifically addressed what could be disclosed to the Investors.  Section 13.20 carves out from the secrecy provisions disclosures "reasonably necessary to comply with federal or

state securities laws." But they expressly limited such disclosures to "the tax treatment and tax structure of the transaction contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure." To underscore the intent to keep the JV LLC Agreement and its terms secret even in the face of the need to comply with the securities laws, Nelson, Nelson Partners, DeGiacinto, Axonic and the Preferred Equity Providers agreed that "[f]or the avoidance of doubt, this authorization is not intended to permit disclosure of the names of, or other identifying information regarding, the participants in the transaction, or of any information or the portion of any materials not relevant to the tax treatment or tax structure of the transaction." Thus, even for securities law compliance Nelson, Nelson Partners, the Trust (acting through Nelson and Nelson Partners), DeGiacinto, Axonic and the Preferred Equity Providers agreed to only provide material "relevant to the tax treatment or tax structure of the transaction." Under the JV LLC Agreement, the existence of the agreement and its terms could not be disclosed to Plaintiffs, including the Mandatory Redemption and Forced Sale provisions. This agreement shows that the failure to disclose the extraordinary rights given to Axonic and the Preferred Equity Providers was either intentional or in reckless disregard of the truth.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**for**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**Against All Defendants**

</div>

76. Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

77. In connection with the sale of the securities — the interests in the Trust — Defendants, using the instrumentality of interstate commerce, made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the

PPM and Supplement not misleading.

78.     Defendants made and omitted the material facts alleged above knowing that their representations and omissions were false or in reckless disregard of the truth.

79.     Defendants' false statements and omissions were material in that any reasonable investor would have considered such information important in deciding whether to invest in the Trust and such information would have materially altered the total mix of information available to the Investors through the PPM and the Supplement.

80.     Plaintiffs relied on Defendants' false representations in the PPM and the Supplement, and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement.  Plaintiffs would not have invested in the Trust had they known the truth.

81.     As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Plaintiffs to suffer damages, which includes the loss of the entire value of their respective investments in the Trust.

82.     The PPM and Supplement, which omitted the material facts, were provided to the Investors in connection with the purchase or sale of securities, the Interests in the Trust.

83.     Thus, Defendants violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their Investment in the Trust.  Plaintiffs have suffered damages in that, as a result of the Defendants' wrongful conduct alleged herein, their interests are now worthless.

1

2

3

**SECOND CLAIM FOR RELIEF**
**for**
**ELDER FINANCIAL ABUSE UNDER CALIFORNIA WELFARE AND**
**INSTITUTIONS CODE SECTIONS 15657.5 AND 15610.30**
**Against All Defendants**

4      84.      Plaintiffs incorporate and re-allege herein by this reference paragraphs

5   1 to 75, inclusive, as though fully set forth at length.

6      85.      As reflected in their respective responses to the Purchaser

7   Questionnaire, Plaintiffs Richard Hanson, Max Dykmans, Dennis Marquardt, Mary

8   James Moore Quillen, Mark A. Campora, Wendy Y. Campora, Giorgina Montellato,

9   David Montellato, John Melville, Frances Gene Weber, Gail Mumma, John

10  Bumbarger, and Valerie Bumbarger were residents of the State of California and

11  were 65 years or older at the time they purchased their respective interests in the

12  Trust and are referred to as the "California Elder Plaintiffs."

13     86.      As alleged above, Defendants, with the intent to defraud, took,

14  appropriated, obtained or retained real or personal property of the California Elder

15  Plaintiffs, by taking, appropriating, obtaining, and retaining the funds invested by

16  the California Elder Plaintiffs in the Trust and taking the Trust Property, in which

17  the California Elder Plaintiffs held beneficial interests.

18     87.      Defendants are, therefore, liable to the California Elder Plaintiffs under

19  California Welfare and Institutions Code § 15657.5 for financial abuse, as defined

20  under California Welfare and Institutions Code § 15610.30.

21     88.      Defendants acted with the intent to cause injury to the California Elder

22  Plaintiffs.  Defendants further engaged in despicable conduct carried out by them

23  with a willful and conscious disregard of the rights of the California Elder Plaintiffs.

24  Defendants thereby subjected the California Elder Plaintiffs to cruel and unjust

25  hardship.  Defendants acted with deceit and concealed material facts from the

26  California Elder Plaintiffs and concealed material facts from the California Elder

27  Plaintiffs, which are alleged above.  Defendants made these material

28  misrepresentations and omissions to induce the California Elder Plaintiffs to

purchase the interests.  Pursuant to California Civil Code section 3294, such acts of oppression, fraud, and/or malice entitle the California Elder Plaintiffs, in addition to the actual damages, to an award of punitive or exemplary damages for the sake of making an example of Defendants and by way of punishing them.

**THIRD CLAIM FOR RELIEF**
**for**
**VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTIONS 25400(D) AND 25500**
**Against All Defendants**

89.    Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

90.    The offer to sell the interests in the Trust to all Plaintiffs originated in California, and all Plaintiffs' offer to buy the interests in the Trust was accepted in California.

91.    Defendants, for the purpose of inducing Plaintiffs' purchase of securities, made or materially participated in the act of making the false and misleading statements of material fact in the PPM and Supplement alleged above and omitted to state material facts alleged above necessary in order to make the statements made in the PPM and Supplement, in light of the circumstances under which they were made, not misleading.

92.    Defendants knew or had reasonable grounds to believe that these statements and omissions were false and misleading.

93.    As the direct and proximate result of the fraudulent conduct of Defendants, Plaintiffs have been damaged.

**FOURTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTIONS 25401 AND 25501**
**Against All Defendants**

94.    Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

95.    The offer to sell the interests in the Trust to all Plaintiffs originated in

COMPLAINT

California, and all Plaintiffs' offer to buy the interests in the Trust was accepted in California.

96.     Plaintiffs are informed and believe and thereon allege that the Defendants reviewed, approved, and participated in the drafting of the PPM's and the Supplement's representations, which included the misrepresentations and omissions alleged above.  Thus, Plaintiffs are further informed and believe and thereon allege that Defendants are responsible for the misrepresentations and omissions in the PPM and the Supplement.

97.     As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

98.     Thus, Defendants violated California Corporations Code §25401 in that they omitted material facts from the PPM and Supplement in connection with the offer and sale of the interests to the California Plaintiffs.  The California Plaintiffs have suffered damages in that, as a result of Defendants' wrongful conduct alleged herein, their interests in the Trust are now worthless.  Therefore, the Plaintiffs sue for rescission and damages.

**FIFTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTION**
**25504.1**
**Against All Defendants**

99.     Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

100.    The offers to sell the interests in the Trust to all Plaintiffs originated in California, and all Plaintiffs' offers to buy the interests in the Trust were accepted in California.

101.    Defendants materially assisted each other in violating California

Corporations Code §25401 with the intent to deceive and defraud Plaintiffs and, under California Corporations Code §25504.1, are liable jointly and severally with each other for their respective violations of California Corporation Code §25401.

102.   Plaintiffs are persons who purchased the interests in the Trust. Plaintiffs sue for rescission and damages.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**For**
**VIOLATION OF ARIZONA REVISED STATUTE SECTION 44-1998(A)**
**Against all Defendants**

</div>

103.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

104.   Plaintiff Dennis Marquardt (the "Arizona Plaintiffs") was a resident of the State of Arizona at the time they purchased their respective interests in the Trust.

105.   The Arizona Plaintiffs are informed and believe and thereon allege that the Defendants reviewed, approved, and participated in the drafting of the PPM's and the Supplement's representations, which included the misrepresentations and omissions alleged above.  Thus, the Arizona Plaintiffs are further informed and believe and thereon allege that Defendants are responsible for the misrepresentations and omissions in the PPM and the Supplement.

106.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused the Arizona Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

107.   Thus, Defendants violated Arizona Revise Statutes §44-1998(A) in that, in connection with the offer and sale of the interests in the Trust to the Arizona Plaintiffs, they made untrue statements of material fact in the PPM and Supplement and they omitted material facts from the PPM and Supplement necessary in order to make the statements made, in the light of the circumstances under which they are

made, not misleading.  The Arizona Plaintiffs have suffered damages in that, as a result of Defendants' wrongful conduct alleged herein, their interests in the Trust are now worthless.  Therefore, the Arizona Plaintiffs sue for the consideration they paid for their interests in the Trust together with interest, less the amount of any income received on their interests in the Trust, on the tender of their interest in the Trust.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF ARIZONA REVISED STATUTE SECTION 44-1991**
**Against All Defendants**

</div>

108.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

109.   The Arizona Plaintiffs were residents of the State of Arizona at the time they purchased their respective interests in the Trust.

110.   The Arizona Plaintiffs are informed and believe and thereon allege that the Defendants reviewed, approved, and participated in the drafting of the PPM's and the Supplement's representations, which included the misrepresentations and omissions alleged above.  Thus, the Arizona Plaintiffs are further informed and believe and thereon allege that Defendants are responsible for the misrepresentations and omissions in the PPM and the Supplement.

111.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused the Arizona Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

112.   Thus, Defendants violated Arizona Revised Statute §44-1991(A)(2) in that, in connection with the offer and sale of the interests in the Trust to the Arizona Plaintiffs, they directly or indirectly made untrue statements of material fact in the PPM and Supplement and they omitted material facts from the PPM and Supplement necessary in order to make the statements made, in the light of the

circumstances under which they are made, not misleading.  The Arizona Plaintiffs have suffered damages in that, as a result of Defendants' wrongful conduct alleged herein, their interests in the Trust are now worthless.  Therefore, pursuant to Arizona Revised Statute §44-2002(A) the Arizona Plaintiffs sue to recover their damages, with interest, taxable court costs, and reasonable attorneys' fees.

<div align="center">

**EIGTH CLAIM FOR RELIEF**
**For**
**VIOLATION OF ARIZONA REVISED STATUTE SECTION 44-2003**
**Against all Defendants**

</div>

113.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

114.   Defendants each participated in and/or induced the sale of the interests in the Trust in violation of Arizona Revised Statute §44-1991(A)(2) and, under Arizona Revised Statute §44-2003, Defendants are jointly and severally liable with each other to the Arizona Plaintiffs for the amount of the Arizona Plaintiffs' damages, with interest, taxable court costs and reasonable attorney fees.

<div align="center">

**NINTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF COLORADO REVISED STATUTE SECTIONS 11-51-501(1) AND 11-51-604(4)**
**Against all Defendants**

</div>

115.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

116.   The Colorado Plaintiffs were residents of the State of Colorado at the time they purchased their respective interests in the Trust.

117.   In connection with the sale of the securities — the interests in the Trust — Defendants made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not misleading.

118.   The Colorado Plaintiffs did not know of such untruths and omissions.

119.   Thus, Defendants violated Colorado Revised Statute §11-55-501(1)(b) in that, in connection with the offer and sale of the interests in the Trust to the Colorado Plaintiffs, they made untrue statements of material fact in the PPM and Supplement and omitted material facts from the PPM and Supplement necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.  The Colorado Plaintiffs have suffered damages in that, as a result of Defendants' wrongful conduct alleged herein, their interests in the Trust are now worthless.  Therefore, pursuant to Colorado Revised Statute 11-51-604(4), the Colorado Plaintiffs sue to recover the consideration paid for their interests in the Trust, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the interests in the Trust, upon the tender of the security.

**TENTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF FLORIDA STATUTES SECTIONS 517.301 AND 517.312**
**Against all Defendants**

120.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

121.   Plaintiffs James Hanford, David Beson, Earl M. Foster, and Nancy R. Foster (the "Florida Plaintiffs") were residents of the State of Florida at the time they purchased their respective interests in the Trust.

122.   In connection with the sale and purchase of the investments and securities — the interests in the Trust — Defendants violated Florida Statutes Section 517.301 in that they made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not misleading.

123.   Defendants were, at a minimum, negligent in making misrepresentations and omitting the material facts alleged.

124.   Such conduct constituted a device, scheme, or artifice to defraud the Florida Plaintiffs.

125.   Such conduct constituted a transaction, practice, or course of business which operated as a fraud or deceit upon the Florida Plaintiffs.

126.   The Florida Plaintiffs justifiably relied on the misrepresentations and omissions by Defendants in investing in the Trust.

127.   Defendants, through their preparation or control of the content of the PPM and Supplement, acted as agents of the direct seller of the securities.

128.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Florida Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

129.   Thus, Defendants violated Florida Securities Act, Florida Statute §517.301 and are liable under Florida Statute §517.312.  Therefore, pursuant to Florida Statute §517.211, the Florida Plaintiffs sue for recission, damages, interest, costs and reasonable attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF
### for
## VIOLATION OF ILLINOIS STATUTES Ch. 815 SECTIONS 5/12 AND 5/13
### Against all Defendants

130.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

131.   Plaintiffs Frank Partipilo, Genevieve M. Partipilo, and Marla Jull Showfer (the "Illinois Plaintiff") was a resident of the State of Illinois at the time he purchased his respective interests in the Trust.

132.   In connection with the sale and purchase of the investments and securities — the interests in the Trust — Defendants violated Illinois Statutes Ch. 815 Section 5/12 in that they made the false statements of material fact in the PPM

and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not misleading.

133.   The Illinois Plaintiffs justifiably relied on the misrepresentations and omissions by Defendants in investing in the Trust.

134.   Defendants, through their preparation or control of the content of the PPM and Supplement, controlled the direct seller of the securities with respect to the content of the PPM and the Supplement.

135.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Illinois Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

136.   Thus, Defendants violated Illinois Statutes Ch. 815 Section 5/12 and are liable under Illinois Statutes Ch. 815 Section 5/13.  Therefore, the Illinois Plaintiffs sue for recission, damages, interest, costs and reasonable attorneys' fees.

**TWELFTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF NEVADA REVISED STATUTES SECTION 90.660**
**Against all Defendants**

137.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

138.   Plaintiff John McDougall (the "Nevada Plaintiffs") was a resident of the State of Nevada at the time he purchased the respective interests in the Trust.

139.   In connection with the sale and purchase of the investments and securities — the interests in the Trust — Defendants made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not

misleading.

140.   Defendants were, at a minimum, negligent in making misrepresentations and omitting the material facts alleged.

141.   Such conduct constituted a device, scheme, or artifice to defraud the Nevada Plaintiffs.

142.   Such conduct constituted a transaction, practice, or course of business which operated as a fraud or deceit upon the Nevada Plaintiffs.

143.   The Nevada Plaintiffs justifiably relied on the misrepresentations and omissions by Defendants in investing in the Trust.

144.   Defendants, through their preparation or control of the content of the PPM and Supplement, controlled the direct seller of the securities with respect to the content of the PPM and the Supplement.

145.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Nevada Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

146.   Thus, Defendants violated Nevada Revised Statutes §90.660 and are liable thereunder.  Therefore, pursuant to Nevada Revised Statutes §90.660, the Nevada Plaintiffs sue for recission, damages, interest, costs and reasonable attorneys' fees.

<div align="center">

**THIRTEENTH CLAIM FOR RELIEF**
for
**VIOLATION OF TEXAS CIVIL STATUTES ART. 581-33**
**Against all Defendants**

</div>

147.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

148.   Plaintiffs Mabel Leung Ho, Marshall Leicht, and Mary Leicht (the "Texas Plaintiffs") were residents of the State of Texas at the time they purchased

their respective interests in the Trust.

149.   In connection with the sale and purchase of the investments and securities — the interests in the Trust — Defendants made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not misleading.

150.   Defendants in the exercise of reasonable care could have known of the untruths and omissions in the PPM and Supplement.

151.   The Texas Plaintiffs justifiably relied on the misrepresentations and omissions by Defendants in investing in the Trust and did not know of the untruths and omissions in the PPM and Supplement.

152.   Defendants, through their preparation or control of the content of the PPM and Supplement, acted as agents of the direct seller of the securities.

153.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Texas Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

154.   Thus, Defendants violated Texas Civil Statutes Art. 581-33 and are liable thereunder.  Therefore, the Texas Plaintiffs sue for recission, damages, interest, costs and reasonable attorneys' fees.

**FOURTEENTH CLAIM FOR RELIEF**
**for**
**VIOLATION OF VIRGINIA STATUTES SECTIONS 13.1.502 AND 13.1.522**
**Against all Defendants**

155.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

156.   Plaintiff Mary James Moore Quillen (the "Virginia Plaintiffs") was a

resident of the Commonwealth of Virginia at the time they purchased their respective interests in the Trust.

157.   In connection with the sale and purchase of the investments and securities — the interests in the Trust — Defendants violated Virginia Statutes Sections 13.1.502 and 13.1.522 in that they made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not misleading.  Thus, Defendants sold such securities by means of fraud or misrepresentation.

158.   Defendants, through their preparation or control of the content of the PPM and Supplement, controlled the direct seller of the securities with respect to the content of the PPM and the Supplement.

159.   Defendants in the exercise of reasonable care could have known of the untruths and omissions in the PPM and Supplement.

160.   The Virginia Plaintiffs justifiably relied on the misrepresentations and omissions by Defendants in investing in the Trust and did not know of the untruths and omissions in the PPM and Supplement.

161.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Virginia Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

162.   Thus, Defendants violated Virginia Statutes Sections 13.1.502 and 13.1.522 and are liable under Section 13.1.522.  Therefore, the Virginia Plaintiffs sue for recission, damages, interest, costs and reasonable attorneys' fees.

////

////

# FIFTEENTH CLAIM FOR RELIEF
### for
## VIOLATION OF WASHINGTON STATUTES SECTIONS 21.20.010 AND 21.20.430
### Against all Defendants

163.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

164.   Plaintiffs Richard M. Sander and Eleanor M. Sander (the "Washington Plaintiffs") were residents of the State of Washington at the time they purchased their respective interests in the Trust.

165.   In connection with the sale and purchase of the investments and securities — the interests in the Trust — Defendants violated Washington Statutes Sections 21.20.010 and 21.20.430 in that they made the false statements of material fact in the PPM and Supplement alleged above and omitted the material facts alleged above that were necessary to make the statements in the PPM and Supplement, in the light of the circumstances under which they are made, not misleading.  Thus, Defendants sold such securities by means of fraud or misrepresentation.

166.   The Washington Plaintiffs justifiably relied on the misrepresentations and omissions by Defendants in investing in the Trust and did not know of the untruths and omissions in the PPM and Supplement.

167.   Defendants, through their preparation or control of the content of the PPM and Supplement, controlled the direct seller of the securities with respect to the content of the PPM and the Supplement.

168.   As alleged above, Defendants' false representations in the PPM and the Supplement and the representations made misleading as a result of Defendants' failure to disclose the omitted facts in the PPM and Supplement have caused Washington Plaintiffs to suffer damages, which includes the entire value of their respective investments in the Trust.

169.   Thus, Defendants violated Washington Statutes Sections 13.1.502 and

13.1.522 and are liable under Section 13.1.522.  Therefore, the Washington Plaintiffs sue for recission, damages, interest, costs and reasonable attorneys' fees.

## SIXTEENTH CLAIM FOR RELIEF
### for
### FRAUD
### Against All Defendants

170.   Plaintiffs incorporates and re-alleges herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

171.   Defendants intentionally made the misrepresentations and omissions alleged above to Plaintiffs.

172.   Defendants intended for Plaintiffs to rely on their misrepresentations and omissions alleged herein.

173.   Plaintiffs were unaware of the falsity of the Defendants' misrepresentations and omissions alleged above.

174.   Plaintiffs reasonably relied on Defendants' misrepresentations and omissions alleged above.

175.   If Plaintiffs had known of the material misrepresentations in, and material information omitted from, the PPM and Supplement alleged herein, they would not have purchased the interests.

176.   As a proximate result of Defendants' deception, Plaintiffs have been damaged in amounts to be determined at trial.

177.   Defendants acted with the intent to cause injury to Plaintiffs. Defendants further engaged in despicable conduct carried out by them with a willful and conscious disregard of the rights of Plaintiffs.  Defendants thereby subjected Plaintiffs to cruel and unjust hardship.  Defendants acted with deceit and concealed material facts from Plaintiffs and concealed material facts from Plaintiffs, which are alleged above.  Nelson Defendants made these material misrepresentations and omissions to induce Plaintiffs to purchase the interests.  Pursuant to California Civil Code section 3294, such acts of oppression, fraud, and/or malice entitle Plaintiffs, in

addition to the actual damages, to an award of punitive or exemplary damages for the sake of making an example of Defendants and by way of punishing them.

## SEVENTEENTH CLAIM FOR RELIEF
### for
### NEGLIGENT MISREPRESENTATION
#### Against All Defendants

178.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

179.   As alleged above, Defendants made misrepresentations and omissions to Plaintiffs in the PPM and Supplement.  Defendants had no reasonable grounds for believing these misrepresentations were true and intended to induce Plaintiffs' reliance on the misrepresentations by purchasing the interests in the Trust.  Plaintiffs were ignorant of the truth and justifiably relied on these misrepresentations by purchasing the interests, as they had no reason not to believe the representations at the time they were made.

180.   Defendants had a legal duty to disclose the truth and the omitted facts to Plaintiffs.  Defendants breached these duties by failing to disclose the same to Plaintiffs.  Plaintiffs were unaware of the true facts and the material information that Defendants concealed from them.  Plaintiffs were damaged by Defendants' failure to the truth and their failure to disclose such material information to Plaintiffs.  Had Defendants fulfilled their legal disclosure obligations and disclosed the truth, Plaintiffs would not have purchased the interests in the Trust.

181.   As a proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs were damaged in an amount to be determined at trial.

## EIGHTEENTH CLAIM FOR RELIEF
### for
### CONSPIRACY TO COMMIT FRAUD
#### Against All Defendants

182.   Plaintiffs incorporate and re-allege herein by this reference paragraphs 1 to 75, inclusive, as though fully set forth at length.

183.   Plaintiffs are informed and believe and thereon allege that in connection with the execution of the JV LLC Agreement, Defendants did knowingly and willfully conspire and agree among themselves to: (1) misrepresent to Plaintiffs that the Trust would use the $75,480,000 in proceeds from the sale of the interests, in part, to repay the $35,000,000 in bridge capital provided by the Preferred Equity Providers and (2) to conceal from Plaintiffs the existence of the JV LLC Agreement and the sweeping rights granted in it to the Preferred Equity Providers.

184.   In furtherance of said conspiracy and agreement, the aforementioned Defendants engaged in fraudulent representations, omissions and concealment of facts, acts of cover-up and statements calculated to obtain from Plaintiffs the funds in which the invested in the Trust for Defendants' benefit and as detailed in this Complaint.  In particular, the conspiracy among Defendants is reflected in the secret JV LLC Agreement that Defendants agreed to keep confidential.

185.   All of the actions of Defendants as alleged in the preceding paragraphs of the Complaint, incorporated herein by reference, were in violation of the rights of Plaintiffs and were committed in furtherance of the aforementioned conspiracies and agreements.  Moreover, each of the Defendants lent aid and encouragement and knowingly financed, ratified, and adopted the acts of the other.  As a proximate result of the wrongful acts herein alleged, Plaintiffs have suffered significant damage in amount to be determined at trial.

186.   Defendants acted with the intent to cause injury to Plaintiffs. Defendants further engaged in despicable conduct carried out by them with a willful and conscious disregard of the rights of Plaintiffs.  Defendants thereby subjected Plaintiffs to cruel and unjust hardship.  Defendants acted with deceit and concealed material facts from Plaintiffs and concealed material facts from Plaintiffs, which are alleged above.  Defendants made these material misrepresentations and omissions to induce Plaintiffs to purchase the interests.  Pursuant to California Civil Code section 3294, such acts of oppression, fraud, and/or malice entitle Plaintiffs, in addition to

the actual damages, to an award of punitive or exemplary damages for the sake of making an example of Defendants and by way of punishing them.

WHEREFORE, Plaintiff request judgment as follows:

A.    An award of restitution or damages to each Plaintiff according to proof;

B.    An award of punitive damages to each Plaintiff as alleged in the Claims for Relief above;

C.    An award of attorneys' fees and costs to the extent permitted by law or contract; and

D.    Such other and further relief as the Court deems is just and appropriate.

Dated: December 28, 2022      **BROWNLIE HANSEN LLP**

_____

ROBERT W. BROWNLIE
Robert.brownlie@brownliehansen.com
Attorneys for Plaintiffs

1

## DEMAND FOR JURY TRIAL

Pursuant to Local Rule 38-1 of the Local Rules of the United States District Court for the Central District of California, Plaintiff hereby demands a trial by jury.

Dated: December 28, 2022          **BROWNLIE HANSEN LLP**

ROBERT W. BROWNLIE
Robert.brownlie@brownliehansen.com
Attorneys for Plaintiffs